SLIP OP.: 99-20

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

| | |
|---|---|
| THE COALITION FOR THE PRESERVATION ) OF AMERICAN BRAKE DRUM AND ROTOR ) AFTERMARKET MANUFACTURERS, ) ) Plaintiff, ) ) v. ) ) THE UNITED STATES ) ) Defendant, ) ) CHINA NATIONAL AUTOMOTIVE ) INDUSTRY IMPORT & EXPORT CO., ) MIDWEST AIR TECHNOLOGIES, INC., MAT ) AUTOMOTIVE INC., SHENYANG HONBASE ) MACHINERY CO., LTD., LAIZHOU LUYUAN ) AUTOMOBILE FITTING CO., LTD., ) QUINGDAO METAL, MINERALS & ) MACHINERY IMPORT & EXPORT CORP., ) YANTAI IMPORT & EXPORT CORP., ) LAIZHOU SANLI MACHINERY-MAKING ) CO., LONGKOU BOHAI MACHINERY CO., ) YENHERE CORP., LAIZHOU CAPCO ) MACHINERY CO., LTD., BEIJING ) XINCHANGYUAN AUTOMOBILE ) FITTINGS CORP., CHINA NATIONAL ) MACHINERY IMPORT & EXPORT CO., ) CHINA NATIONAL MACHINERY IMPORT ) & EXPORT (XINJIANG) CO., XIANGHE ) ZICHEN GROUP CO., HEBEI METALS AND ) MACHINERY IMPORT & EXPORT CORP., ) SHANXI MACHINERY AND EQUIPMENT ) IMPORT & EXPORT CORP., CHINA NORTH ) INDUSTRIES CORP. (GUANGZHOU), ) CHINA NORTH INDUSTRIES CORP. (DALIAN),) JILIN PROVINCIAL MACHINERY AND ) EQUIPMENT IMPORT & EXPORT CORP., ) XU ZHOU YUNHE (CANAL) ) MACHINERY, LONGJING WALKING ) | Consol. Court No. 97-05-00874 Before: Judge Evan J. Wallach  **PUBLIC VERSION** |

TRACTOR WORKS FOREIGN TRADE            )
IMPORT & EXPORT CORP., CHANGZHI        )
AUTOMOTIVE PARTS FACTORY, ZIBO         )
BOTAI MANUFACTURING CO., LTD., AND     )
SOUTHWEST TECHNICAL IMPORT             )
& EXPORT CORP.,                        )
                                       )
                    Defendant-Intervenors.    )
_____)

[Plaintiff's Motion for Judgment on the Agency Record is denied.]

                                        Decided: February 19,1999

        Porter, Wright, Morris, Arthur (Leslie Alan Glick) for Plaintiff.

        David Ogden, Assistant Attorney General; David M. Cohen, Director, Lucius Lau,
Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, and Linda
S. Chang, Attorney of Counsel, Office of the Chief Counsel for Import Administration, U.S.
Department of Commerce.

        White & Case (William J. Clinton and Adams Lee) for Defendant-Intervenors.


                                **OPINION**


                                    **I.**

                            **INTRODUCTION**


        Plaintiff, The Coalition for the Preservation of American Brake Drum and Rotor

Aftermarket Manufacturers (the "Coalition"),[1] brings this action pursuant to Rule 56.2 of the

Rules of this Court for judgment on the agency record.  Plaintiff contests certain aspects of the

---

[1]     The Coalition is composed of the following companies: Brake Parts, Inc., McHenry IL.;
Kinetic Parts Manufacturing, Inc., Harbor City, CA; Iroquois Tool Systems, Inc., North East,
PA; and Wagner Brake Corp., St. Louis, MO.

Department of Commerce, International Trade Administration's ("ITA" or "Commerce") final

results entitled Notice of Final Determinations of Sales at Less Than Fair Value: Brake Drums

and Brake Rotors from the People's Republic of China, 62 Fed. Reg. 9160 (1997) ("Final

Determinations") and the final amended determinations entitled Notice of Amended Final

Determinations of Sales at Less Than Fair Value: Brake Drums and Brake Rotors from the

People's Republic of China, 62 Fed. Reg. 15,655 (1997).  The period of investigation ("POI")

covered each exporter's two most recent fiscal quarters prior to the filing of Plaintiff's petition.

Final Determinations at 9161.[2]  For Respondent Southwest Import & Export Corp.

("Southwest"), the POI is June 1995 through December 1995.  Id.  For all other Respondents, the

POI is July 1995 through December 1995.[3]  Id.


        The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).

---

[2]     Because the administrative review at issue was initiated after January 1, 1995, the
applicable statutory provisions are the amendments made by the Uruguay Round Agreements
Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994).

[3]     Other Respondents include: China National Automotive Industry Import & Export, Co.,
Midwest Air Technologies, Inc., Mat Automotive Inc., Shenyang Honbase Machinery Co., Ltd.,
Laizhou Luyuan Automobile Fittings Co., Ltd., Quingdao Metal Minerals & Machinery Import
& Export Corp., Yantai Import & Export Corp., Laizhou Sanli Machinery-Making Co., Longkou
Bohai Machinery Co., Yenhere Corp., Laizhou CAPCO Machinery Co., Ltd., Beijing
Xinchangyuan Automobile Fittings Corp., China National Machinery and Equipment Import &
Export Co., Xinghe Zichen Group Co., Hebei Metals & Machinery Import & Export Corp.,
Shanxi Machinery and Equipment Import & Export Corp., China North Industries Corp.
(Guangzhou), China North Industries Corp. (Dalian), Jilin Provincial Machinery and Equipment
Import & Export Corp., Xu Zhou Yunhe (Canal) Machinery, Longjing Walking Tractor Works
Foreign Trade Import & Export Corp., Changzhi Automotive Parts Factory, and Zibo Botai
Manufacturing Co.

## II.

## <u>BACKGROUND</u>

On March 7, 1996, Plaintiff filed an antidumping petition with the ITA and the United States International Trade Commission ("ITC" or "Commission") requesting the initiation of an antidumping investigation on certain brake drums and rotors from the People's Republic of China ("PRC" or "China").  On April 3, 1996, the ITA published its notice of initiation of antidumping investigations of brake drums and rotors from China.  <u>Initiation of Antidumping Duty Investigations: Certain Brake Drums and Certain Brake Rotors from the People's Republic of China</u>, 61 Fed. Reg. 14,740 (1996).

On October 10, 1996, Commerce published its preliminary determinations of sales at less-than-fair value ("LTFV").  <u>Notice of Preliminary Determinations of Sales at Less Than Fair Value and Postponement of Final Determinations: Brake Drums and Brake Rotors from the People's Republic of China</u>, 61 Fed. Reg. 53,190 (1996) ("<u>Preliminary Determinations</u>").  On February 28, 1997, Commerce published its final affirmative determinations of sales at LTFV for both brake drums and rotors.  <u>Final Determinations.</u>

On April 16, 1997, the ITC issued its decision finding that a United States industry was not being materially injured or threatened with material injury by reason of imports of certain brake drums from China.  In contrast, the Commission made an affirmative injury determination concerning certain brake rotors.  <u>See</u> <u>Certain Brake Drums and Rotors From China</u>, 62 Fed. Reg.

18,650 (1997).[4]

On May 16, 1997, Plaintiff filed two summonses in this Court contesting some aspects of Commerce's affirmative LTFV determinations as to brake drums (Court No. 97-05-00874) and brake rotors (Court No. 97-05-00875).[5]  Specifically, Plaintiff claimed that Commerce erred in its:  1)  decision not to apply "facts available" to all Respondents; 2) solicitation and reliance on publicly available information from the Respondents; 3) rejection of part of Plaintiff's administrative case brief; 4) determination to apply separate rates for selected Respondents; 5) assignment of averaged selected Respondents' rates  to non-selected Respondents; 6) critical circumstances determination with regards to non-selected Respondents; 7) rejection of Indian surrogate values from Shivaji Works Limited ("Shivaji"); and  8) use of an Indian surrogate value from Jayaswals Neco Limited ("Jayaswals") for castings for Respondent and selection of surrogate values for various other factors of production.

---

[4]      Plaintiff challenged the ITC brake drum determination in this Court in Court No. 97-05-00876.  The Court affirmed the ITC finding of no material injury or threat of material injury of certain brake drums in The Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States, 15 F. Supp.2d 918 (CIT 1998).

[5]      On September 16, 1997, the Court granted the consent motion to consolidate the two actions into Court No. 97-05-00874.

**III.**

**DISCUSSION**

**A.**

**The Standard of Review For ITA Determinations Requires Affirmation
Unless A Determination Is Unsupported By Substantial Record
Evidence Or Otherwise Not In Accordance With Law.**

The Court "shall hold unlawful any determination, finding or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1) (1994). Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York

Inc. v. N.L.R.B., 305 U.S. 197, 229 (1938).

**B.**

**Commerce's Determination To Rely On Respondents' Reported
Information Instead Of Facts Otherwise Available Is
Supported by Substantial Evidence.**

Pursuant to 19 U.S.C. § 1677e(a) (1994) Commerce is required to use facts otherwise

available[6] if necessary information is not available on the record, or:

(2) an interested party or any other person -

      (A) withholds information that has been requested by the
      administering authority or the Commission under this subtitle,

---

[6]    Formally referred to as "best information available" or "BIA" under 19 U.S.C. § 1677e(c)
(1988).

(B) fails to provide such information by the deadlines for
submission of the information or in the form and manner
requested, subject to subsections (c)(1) and (e) of section 1677m of
this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be
verified as provided in section 1677m(i) of this title.[7]

Section 1677e(a) additionally provides that the use of facts available shall be subject to

the limitations set forth in 19 U.S.C. § 1677m(d) (1994). 19 U.S.C. § 1677e(a) (1994). Section

1677m(d) provides that if Commerce:

determines that a response to a request for information under this subtitle does not
comply with the request, [Commerce] . . . shall promptly inform the person
submitting the response of the nature of the deficiency and shall, to the extent
practicable, provide that person with an opportunity to remedy or explain the
deficiency in light of the time limits established for the completion of
investigations or reviews under this subtitle. If that person submits further
information in response to such deficiency and either -

(1) the [Commerce] finds that such response is not satisfactory, or
(2) such response is not submitted within the applicable time
limits,

then [Commerce] may, . . . disregard all or part of the original and subsequent
responses.

This statute "is designed to prevent the unrestrained use of facts available as to a firm

---

[7]     The 1988 statute was amended by the URAA, Pub.L. No. 103-465, § 231 (1994), to
conform to the requirements of Article 6.8 and Annex II of the Agreement on Implementation of
Article VI of the General Agreement on Tariffs and Trade ("GATT") 1994. Agreement on
Implementation of Article VI of the GATT 1994, Annex II, April 15, 1994 [hereinafter
"Antidumping Code"], Marrakesh Agreement Establishing the World Trade organization
[hereinafter "WTO Agreement"], Annex 1A, reprinted in The Results Of The Uruguay Round Of
Multilateral Trade Negotiations: The Legal Texts 168 (World Trade Organization 1995) (1994).

which makes its best effort to cooperate with the Department [of Commerce]. This section was enacted, as part of the URAA, Pub. L. 103-465 § 231, to implement portions of Annex II to the AD Agreement,[8] which provides, in part, that information which 'may not be ideal' should not be disregarded if the party 'has acted to the best of its ability.'" Borden Inc. v. United States, 4 F. Supp.2d 1221, 1245 (CIT 1998).[9]

If Commerce determines that use of facts available is warranted, Section 1677e(b) permits an adverse inference if Commerce can make an additional finding that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b) (1994).

In this case, after the ITA issued questionnaires, the investigated Respondents[10] submitted responses, some of which were later found to contain errors and omissions. Commerce, in accordance with 19 U.S.C. § 1677m(d) (1994), allowed these Respondents to correct and supplement these errors before and during verification. Consequently, Commerce relied on this

---

[8] Antidumping Code

[9] Annex II of the Antidumping Code "sets forth general guidelines intended to prevent the arbitrary imposition of 'facts available,' particularly where the form rather than the substance of submitted information is at issue." Corr, Christopher, Trade Protection in the New Millennium: The Ascendancy of Antidumping Measures, 18 NW. J. Int'l L. & Bus. 49, 78 n.145 (1997).

[10] Commerce did not have sufficient resources to investigate all Respondents who submitted questionnaire responses. See Memorandum from Magd A. Zalok to Barbara Stafford of 7/19/96 ("Zalok Memo"), ITA Pub. Doc. 170.

information, having found that the "revisions were not unduly extensive" and that there was "no

basis to conclude that these errors affect the overall integrity of the response." Final

Determinations at 9167.


Plaintiff initially argues that the ITA improperly allowed these Respondents to submit

revisions and corrections to their questionnaire responses.  See Memorandum of Law in Support

of Plaintiff's Rule 56.2 Motion For Judgment Upon The Agency Record ("Plaintiff's Brief") at 4-

12.   Additionally, Plaintiff alleges that Commerce should have rejected these Respondents' data

and applied "facts otherwise available" or the China-wide rate to calculate Respondents' margin.

Id.  Plaintiff contends that these Respondents "significantly impede[d] a proceeding under the

antidumping law by providing incorrect data or by failing to provide data." Id. at 11 (quoting 19

U.S.C. § 1677e(a)(2)(C)).   Specifically, Plaintiff cites to numerous examples of errors raised in

the verification reports of selected Respondents.[11]  Id. at 4-12. Because many of these responses

---

[11]      See Verification of the Responses of Changzhi Autom. Parts Factory ("Changzhi"), ITA
Pub. Doc. 320 at 3, 10 (correcting control numbers, correcting supplier distances); Verification
of the Responses of Beijing Xinchangyuan ("XCY"),  ITA Pub. Doc. 423 at 8, 12-14 (correcting
reporting of  brokerage and handling expenses, correcting reversal of weights of steel strip and
nails, correcting labor hours worked for July and October, noting lack of sales reported for
October could not be substantiated); Verification of the Responses of Shenyang Honbase
("Shenyang"), ITA Pub. Doc. 422 at 8-10 (reconciling stopwatch-time labor hours and reported
headcount hours, reclassifying administration, food and water service, security personnel, drivers
and heating room labor as general and administrative expenses, correcting mode of transportation
for bearing cups and balance weights); Verification of the Responses of Laizhou CAPCO, ITA
Pub. Doc. 435 at 1, 15 (correcting consumption of steel scrap to include iron scrap, correcting
weights for lugs and bearings cups, finding clerical error in weight of cardboard packing carton
resulted in understatement but noting differences were not of significant magnitude); Verification
of the Responses of Laizhou Luyuan, ITA Pub. Doc. 418 at 2, 9-10 (correcting revisions
submitted by Laizhou including, inter alia, final 1995 financial statements, worksheets for hours
of unskilled workers, kerosene and balance weights, noting that certain workers may be included

were allegedly "boilerplate and incomplete," id. at 4, or "late corrections made days before or

even at verification," id. at 5, Plaintiff argues they should be rejected in favor of facts otherwise

available.

As a threshold matter, Plaintiff's contention that the ITA erroneously allowed

Respondents to submit revisions to their questionnaire responses is misplaced. During the course

of the investigation, Commerce informed Respondents that "[n]ew information will be accepted

at verification only when . . . the information makes minor corrections to the information already

on the record, or . . . the information corroborates, supports, or clarifies information already on

the record." Letter from Gary Taverman to William J. Clinton of 10/17/96, ITA Pub. Doc. 357 at

2. Commerce's action conforms with the statutory directive of 19 U.S.C. § 1677m(d) (1994)

which allows for the submission of new information at verification in order to "remedy or

explain" a deficiency.[12] Cf. Koenig & Bauer-Albert AG v. United States, 15 F. Supp.2d 834,

---

to recalculate labor usage; noting that reported inventory figures are based on oral estimates and
thus not confirmable); Verification of the Responses of Yangtze Machinery Co. ("Yangtze"),
ITA Pub. Doc. 432 at 6-11 (correcting, inter alia, consumption amounts for dehydrating oil used
in April and May 1995, cleaning agent in May 1995 and pig iron and ferrosilicon, correcting
weights for bolts and bearing cups, recalculating kilowatt hours per piece, correcting weight of
packing material); Verification of the Responses of Laizhou Magnetic Iron Powder Clutch
General Factory ("Laizhou MIP"), ITA Pub. Doc. 433 at 2, 21-23 (correcting minor changes
submitted by Respondent, noting Respondent's over-reporting of corrugated cartons, steel strip
usage, wood crates, iron nails and adhesive tape); Verification of the Responses of Southwest,
ITA Pub. Doc. 425 at 5 (providing only one purchase order from the POI to explain sales
process); Verification of the Responses of China National Automotive Import & Export Corp.
("CAIEC"), ITA Pub. Doc. 428 at 1 (acknowledging minor revisions made by Respondent at
verification such as 16 cents differential in invoice I95E/16078).

[12]     The Court finds that Commerce reasonably found that the "failure to initially submit an
error-free response, or the correction of these errors, should [not] result in the use of facts

845 (CIT 1998) ("Congress has afforded ITA a degree of latitude in implementing its verification

procedures.") (citation omitted).

The Court must also reject Plaintiff's argument that the "quantity and substance of

inaccurate and incomplete [questionnaire] answers" submitted by Respondents require the

application of "facts available."  Plaintiff's Brief at 4.

Commerce possesses the "'discretion to determine whether a Respondent has complied

with an information request.'" Helmerich & Payne, Inc. v. United States, 24 F. Supp.2d 304, 308

(CIT 1998) (quoting Daido Corp. v. United States, 19 CIT 853, 861, 893 F. Supp. 43, 49-50

(1995)).  Through verification, Commerce tests the information provided by a party for accuracy

and completeness so that Commerce can justifiably rely upon that information.  Tatung Co. v.

United States, 18 CIT 1137, 1140 (1994).  Commerce usually concludes that errors in a response

that are not substantial do not effect the integrity of the response. See e.g., Ferrosilicon from

Brazil: Final Results of Antidumping Duty Administrative Review, 61 Fed. Reg. 59,407, 59,409

(1996).[13]   "[T]he issue is not the value of the errors as a percentage of total U.S. sales, or the

---

available." Final Determinations at 9167.  Commerce's approach conforms to the reasoning of
Annex II of the Antidumping Code explained *supra* at Note 8.  Antidumping Code, Annex II,
Para. 6 ("even though information provided may not be ideal in all respects, this should not
justify the authorities from disregarding it, provided the interested party has acted to the best of
its ability").

[13]     For example, Plaintiff describes Respondent Yangtze's incorrectly reported packing
material data as a material and substantial error.  Plaintiff's Brief at 9.  In contrast, Commerce
calculated a 0.0002 kg weight differential for some models and noted that the errors were minor.
See Verification of the Responses of Yangtze, ITA Pub. Doc. 432 at 10-11. Similarly, Plaintiff

number of instances of errors. Rather the issue is the nature of the errors and their effect on the validity of the submission." Tatung, 18 CIT at 1141.

In this case, Respondents submitted the necessary information required to make a proper dumping determination, and Commerce verified the responses as accurate and reliable. Commerce found that Respondents' revisions to their responses were not "unduly extensive" and the errors corrected by Commerce at verification did not "affect the overall integrity of the response." Final Determinations at 9167.[14] Moreover, as Defendant-Intervenor aptly notes, "in every instance in which the Department encountered errors, the Department was able to verify the correct information." Defendant-Intervenors' Response Memorandum of Law at 18; see also

_____

contends that Respondent Southwest's provision of only one purchase order from the POI to explain its sales process demonstrates an inability or unwillingness to cooperate, justifying the use of facts available. Plaintiff's Brief at 7. However, the verification report indicates that Respondent Southwest supplemented its response with at least eight other documents to explain its sales process. See Verification of the Responses of Southwest, ITA Pub. Doc. 425 at 5.

[14]    Plaintiff claims that Light Walled Welded Rectangular Carbon Steel Tubing from Argentina, 54 Fed. Reg. 13,913, 13,915 (1989) stands for the proposition that Commerce rejects late corrections made days before or even at verification in favor of BIA. Plaintiff's Brief at 5. It is, however, distinguishable since Commerce, in that determination, while noting that allowances are made for minor revisions to questionnaire responses during verification, relied on BIA. Commerce used BIA because the new information submitted by Respondents during verification prevented Commerce analysts from verifying other products which they would have normally verified. In this case, Commerce was able to verify all the information. Final Determinations at 9164.

Empresa Nacional Siderurgica S.A. v. United States, 880 F. Supp. 876, 880 (CIT 1995), cited by Plaintiff, is also distinguishable. In that case, Commerce applied BIA because the respondents never submitted questionnaire responses to an entire section relating to cost of production/constructed value data, despite an additional eight day extension. Here, Respondents fully cooperated with the ITA.

Final Determinations at 9167 (all such deficiencies can be corrected using verified data on the

record).[15]  Therefore, "[i]n the end, the errors were corrected and the data were verified."

Magnesium Corp. of America v. United States, 938 F. Supp. 885, 903 (CIT 1996).  Plaintiff does

not allege that Commerce incorrectly calculated the margins or implemented an arbitrary

verification methodology.  Plaintiff "rather, proposed a blind, punitive use of [facts otherwise

available], which is clearly disfavored."  Id.

Finally, to the extent that Plaintiff argues for the application of adverse facts available,

the Court finds that "'Commerce could not resort to adverse [facts otherwise available] because

[Respondents] complied with all information requests.'"  Peer Bearing Co. v. United States, Ct.

No. 97-01-00023, 1998 WL 283544, *4 (CIT May 27, 1998) (citing Shieldalloy v. United States,

975 F. Supp. 361, 363 (CIT 1995).

Therefore, upon review of the administrative record, the Court concludes that

Commerce's determination to rely on the Respondents' reported information and not resort to

---

[15]     In this regard, Plaintiff's reliance on Union Camp Corp. v. United States, 941 F. Supp.
108, 115 (CIT 1996) is unjustified.  See Plaintiff's Brief at 9.  Plaintiff cites to Union Camp to
argue that, as in the case at bar, where Respondents fail to specify "the amount, weight, and type
of packing materials used," Commerce justifiably may rely on BIA.  Id.  In this case,
Respondents did not fail to respond, but Respondent XCY reversed the weight of the nails and
steel strip, and the discrepancy was corrected by Commerce.  Verification of the Responses of
XCY, ITA Pub. Doc. 423 at 12.   Commerce noted no other discrepancies. Id.  In addition, while
the Court notes that Commerce did find "minor discrepancies" in the reporting of Respondent
Yangtze's packing material, most of the errors involved Yangtze over reporting the required
weights.  Verification of the Responses of Yangtze, ITA Pub. Doc. 432 at 10-11; see also
Verification of the Responses of Laizhou MIP, ITA Pub. Doc. 433 at 21-22.

facts otherwise available is supported by substantial evidence and is otherwise in accordance

with law.

**C.**

**The ITA's Decision To Request Publically**
**Available Information From The Parties Is Supported**
**By Substantial Evidence And In Accordance With Law.**

Well-settled principles of administrative law afford an agency broad discretion to fashion

its own rules of administrative procedure, including the authority to establish and enforce time

limits concerning the submission of written information and data.  Vermont Yankee Nuclear

Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 544-45 (1978).  In

accord with those principles, Commerce has promulgated regulations which set forth the time

limits governing the submission of factual information.

For time limits generally, 19 C.F.R. § 353.31(a) (1997) requires that "submissions of

factual information for the Secretary's consideration shall be submitted not "later than . . . seven

days before the scheduled date on which the verification is to commence."  In addition, 19 C.F.R.

§ 353.31(a)(2) (1997) allows any interested party to "submit factual information to rebut, clarify,

or correct factual information submitted by an interested party . . . at any time prior to the

deadline provided in this section for submissions of such factual information or, if later, 10 days

after the date such factual information is served on the interested party. . . ."

The regulations further provide time limits for instances where the Secretary requests or solicits factual information. 19 C.F.R. § 353.31(b) (1997) states, in part:

(1) Notwithstanding paragraph (a) of this section, the Secretary may request any person to submit factual information at any time during a proceeding.

(2) In the Secretary's written request to an interested party for a response to a questionnaire or for other factual information, the Secretary will specify the time limit for response.

On December 19, 1996, Commerce solicited additional publicly available information ("PAI") regarding surrogate values for its "factors of production" analysis from the parties and notified them that the deadline for "published information to be considered in the final determinations is January 10, 1997." Letter from Gary Taverman to Leslie Glick of 12/19/96, ITA Pub. Doc. 412. Two groups of Respondents submitted PAI relating to surrogate country data within the established deadline. See Letter from Katten Muchin & Zavis to Secretary of Commerce of 1/9/97, ITA Pub. Doc. 434; see also Letter from White & Case to Secretary of Commerce of 1/10/97, ITA Pub. Doc. 443. Plaintiff did not submit any information within that period.

Plaintiff, however, contends that Commerce improperly allowed Respondents to submit new PAI three months after the preliminary determination of October 10, 1996 and 49 days before the final determination. Plaintiff's Brief at 12. Instead of relying on the new PAI, Plaintiff argues that the ITA should have used the related data submitted by Plaintiff in its submission of August 20, 1996. Id. at 12-13. In the alternative, Plaintiff argues that even if the

ITA properly accepted Respondents' PAI, the ITA erred by denying Plaintiff the ability to respond with rebuttal PAI pursuant to 19 C.F.R. § 353.31(a)(2)(1997) (allowing 10 days to respond to new factual information). Id. at 13. Finally, Plaintiff argues that denial of Plaintiff's ability to respond to the PAI amounted to a violation of its procedural due process rights. Plaintiff's Reply Memorandum of Law ("Plaintiff's Reply Brief") at 6.

Since the regulations plainly permit Commerce to request factual information **at any time**, Commerce's request for PAI after issuance of the preliminary determination was not contrary to law. 19 C.F.R. § 353.31(b) (1997); see Floral Trade Council of Davis, CA v. United States, 15 CIT 497, 502, 775 F. Supp. 1492, 1499 (1991) ("Clearly, the regulations give ITA flexibility to obtain information necessary to its decision . . . ."); Torrington Co. v. United States, 965 F. Supp. 40, 44 (CIT 1997). In an antidumping investigation, "[t]he statute clearly permits Commerce to obtain information on its own initiative rather than just relying on information submitted to it." Wieland-Werke AG v. United States, 4 F. Supp.2d 1207, 1212 (CIT 1998). Indeed, Plaintiff cites no authority to support its contentions and conceded at oral argument that Commerce possessed authority to request the information.

Plaintiff also argues that 19 C.F.R. § 353.31(a)(2) (1997) requires that Plaintiff have ten additional days from the January 10, 1997 deadline established by Commerce to submit factual information rebutting Respondents' PAI. Plaintiff's Brief at 13. Defendant argues that Plaintiff is simply attempting to set its own time limits for the submission of factual information. Defendant's Memorandum in Opposition to the Rule 56.2 Motion for Judgment Upon the

Agency Record Filed by the Coalition for the Preservation of American Brake Drum and Rotor

Aftermarket Manufacturers ("Defendant's Response") at 14.  Whether or not the additional ten

day time to respond should apply to 19 C.F.R. §353.31(b)(2) (1997) is however, an issue which

needs not be decided, as the administrative record is devoid of evidence indicating that Plaintiff

requested or even attempted to submit rebuttal PAI.[16]   Since Plaintiff did not attempt to submit

its "rebuttal" PAI, the Court is unable to examine whether or not this data would have fallen

within the purview of 353.31(a)(2) by rebutting, clarifying, or correcting Respondents' PAI.  Cf.,

Zenith Electronics Corp. v. United States, 18 CIT 320 (1994).


        Plaintiff raises its due process argument for the first time in its Reply Brief in violation

of USCIT R. 81(l) which provides that "[a] reply brief shall be confined to rebutting matters

contained in the brief of the respondent[s]."  Nevertheless, "the Court may exercise its discretion

to prevent knowingly affirming a determination with errors."  Torrington Co. v. United States,

Ct. No. 95-03-00345, 1997 WL 589412, at *3 (CIT Sept. 19, 1997).  If Plaintiff had raised a

clear error in its argument, the Court could consider the argument.  Plaintiff's argument,

however, is clearly erroneous and the Court declines to permit its assertion.[17]

---

[16]      Plaintiff contends, in an argument made dehors the record, that in a telephone
conversation with Brian Smith of Commerce sometime in January 1997, Plaintiff's request for
permission to submit rebuttal PAI was denied.  Plaintiff's Brief at 12 & n.3.  This information is
inadmissible as it falls outside the scope of the administrative record.  See 19 U.S.C. §
1516a(b)(2)(A) (1994) (defining contents of administrative record).  Plaintiff's counsel conceded
in oral argument that he could have memorialized the conversation and placed it in the record by
writing a letter to Commerce.

[17]      Compare PPG Industries, Inc. v. United States, 13 CIT 183, 708 F. Supp. 1327 (1989)
(relied on by Plaintiff), and NTN Bearing Corp. v. United States, 15 CIT 75, 83, 757 F. Supp.

**D.**

**The ITA Did Not Err by Rejecting**
**Part of Plaintiff's Pre-Hearing Brief.**

As discussed above, the relevant regulation cautions parties that Commerce will not

consider untimely, unsolicited factual information.  See  19 C.F.R. § 353.31(a)(1)(i) (time limit

for submitting factual information is no later than seven days before the scheduled date on which

the verification is to commence).[18]  "Commerce's policy of setting time limits on the submission

of factual information is reasonable because Commerce 'clearly cannot complete its work unless

it is able at some point to "freeze" the record and make calculations and findings based on that

fixed and certain body of information.'" Gulf States Tube Division of Quantex Corp. v. United

States, 981 F. Supp. 630, 653 (CIT 1997) (citation omitted).

In this case, Commerce rejected certain parts of Plaintiff's Pre-Hearing Brief on Behalf of

Petitioner, The Coalition for the Preservation of American Brake Drum and Rotor Aftermarket

Manufacturers ("Plaintiff's Pre-Hearing Brief") as containing new and unsolicited, factual

information submitted after the regulatory time limit.  Letter from Commerce to Leslie Glick of

---

1425, 1433 (1991), aff'd, 972 F.2d 1355 (Fed. Cir. 1992) (Plaintiffs' active participation in the
hearing and submission of briefs on the issue . . . as well as their repeated correspondence with
the ITA on this issue, belie their claim that they were denied due process rights. . . ."); see also
Timken Co. v. United States, 12 CIT 955, 966, 699 F. Supp. 300, 309 (1988), aff'd 894 F.2d 385
(Fed. Cir. 1990).

[18]      "The Secretary will not consider in the final determination . . . or retain in the record of
the proceeding, any factual information submitted after the applicable time limit.  The Secretary
will return such information to the submitter with written notice stating the reasons for return of
the information."  19 C.F.R. § 353.31(a)(3) (1997).

1/23/97, ITA Pub. Doc. 476.  The information was attached as Exhibits 8 and 9 and incorporated on pages 30 and 31 of Plaintiff's Pre-Hearing Brief.  Pre-Hearing Brief,  ITA Pub. Doc. 460. The relevant portion of Exhibit 8 states that after the announcement of a 42-65% duty rate for PRC exports, "many factories increased prices in the 2 to 10% range."  Id. at Exh. 8.  Based on this data, Plaintiff concluded that the lack of correlation between the large duty rate imposed and the small increase in price would "indicate a massive diversion of shipments between companies in China to shift exports to the lower rate companies."  Id.

Exhibit 9 contained an analysis of the public versions of the verification reports to determine if "the information reported was consistent with known and accepted practices in the industry for production, accounting, sales, etc."  Id. at 31.   Based on this data, Plaintiff concluded that Respondents' answers lacked credibility.  Both exhibits were authored by Barry Breslow, an individual described by Plaintiff as an "industry expert" who has "had years of experience."  Id.

Plaintiff argues that the data rejected by Commerce is not new and untimely factual information, but rather "analysis of old factual information that Plaintiff submitted earlier in the investigation."  Plaintiff's Brief at 15.  Specifically, Plaintiff contends that Exhibit 8 contains "an analysis of the imports of the subject merchandise" and Exhibit 9 contains "an analysis of the ITA's verification reports for Respondents Laizhou CAPCO, CAIEC, Qingdao, Norenco, XCY, Shenyang Honbase, Laizhou Luyan, Midwest Air Technologies, Changzhi Automotive Parts Factory, Yangtze, MMB International, and Southwest."  Id. at 15-16.

In the alternative, Plaintiff claims that even if its submissions could be construed as factual instead of analytical information, the regulations allow for the submission of "additional factual information, ten days after the submission of data submitted by another party if it is to 'rebut, clarify, or correct factual information submitted by an interested party. . . .'" Id. at 16 (citing 19 C.F.R. 353.31(a)(2)).  Thus, Plaintiff contends that its submission should have been accepted "because it was submitted within ten business days of receiving the [PAI] information submitted by Defendant-Intervenors."  Id.

Finally, according to Plaintiff, since the rejected information was submitted during the "course of the proceeding" pursuant  to 19 U.S.C. § 1516a(b)(2), it should not have been removed from the administrative record.  Id.   Section 1516a(b)(2)(A) states, in pertinent part, that "the record . . . shall consist of - (I) a copy of all information presented to or obtained by [Commerce] during the course of the administrative proceeding . . . ."

The Court finds that Commerce's decision to reject part of Plaintiff's Pre-Hearing Brief is supported by substantial evidence and in accordance with law.  Plaintiff's proposed exhibits reveal new and untimely factual information, and, therefore, Plaintiff's reliance on them is impermissible.

Factual information is defined as "(1) Initial and supplemental questionnaire responses; (2) Data or statements of fact in support of allegations; (3) Other data or statements of facts; and

(4) Documentary evidence."  19 C.F.R. § 353.2(g) (1997).  While it is true that information

constituting a reinterpretation of evidence that was before Commerce is permissible, AK Steel

Corp. v. United States, 988 F. Supp. 594, 602 (CIT 1997); see also Verson v. United States, 5 F.

Supp.2d 963, 968 n.11 (CIT 1998) ("At the court's discretion, calculations are admissible into

evidence if the underlying data upon which they are based is admissible."), in this case, Plaintiff's

rejected submission contains new factual data as opposed to calculations or analysis gleaned

from the record.


        This data falls squarely into the regulatory definition of factual information as "data or

statements of fact in support of allegations." 19 C.F.R. § 353.2(g) (1997).  Plaintiff has failed to

carry its burden of proving that the rejected information was only an analysis of information

already contained in the record.  See Nation Ford Chem. Co. v. United States, 985 F. Supp. 133,

136 (CIT 1997) ("The burden of creating an adequate record lies with the party challenging

Commerce's determination . . . .").  Plaintiff's only explanation is its cursory conclusion that the

analysis was based on "old factual information that Plaintiff submitted earlier in the investigation

- the verification reports."  Plaintiff's Reply Brief at 7.  Plaintiff fails to indicate where in the

reports the information can be found.  Id.


        Moreover, as noted by Defendant, Plaintiff's argument fails because Breslow's analysis of

old factual information was expressly offered as an expert opinion.  Breslow's theories of mass

diversion of shipments and his analysis of whether Respondents reported information was

consistent with accepted industry standards clearly assumes the weight of evidence.[19]   Although

Plaintiff contends in its Reply Brief that Mr. Breslow is "not an outside expert but an employee

of a member of the Coalition that was providing an analysis of existing factual information,"

Plaintiff's Reply Brief at 7, that argument is jejune.  It ignores Plaintiff's designation of Breslow

as an "industry expert" in its Pre-Hearing Brief, ITA Pub. Doc. 460 at 31 ("XII.  ANALYSIS OF

ERRORS AND INCONSISTENCIES BY INDUSTRY EXPERT"), and Plaintiff's "distinction"

between in-house and outside experts goes only to the weight to be accorded Breslow's

testimony, not his status.


Because the administrative record reflects that Plaintiff's unsolicited factual information

was submitted outside the time limit provided in 19 C.F.R. § 353.31(a)(1)(i) (1997), Commerce's

decision was in accordance with law.  See Emerson Power Transmission Corp. v. United States,

19 CIT 1154, 1160, 903 F. Supp. 48, 54 (CIT 1995) ("In general, this court has upheld

Commerce's rejection of untimely factual information pursuant to 19 C.F.R. § 353.31(a).").


Even if the data rejected by Commerce in Exhibit 8 had been accepted, the record

demonstrates that Commerce actually addressed Plaintiff's argument.  In response to Petitioner's

concern over the mass diversion of shipments between exporters, Commerce stated that it,

---

[19]       "[A]n expert witness' testimony explaining the terms of a trade is evidence, even though
its purpose is to help the fact finder understand the direct evidence presented."  Lillie v United
States, 953 F.2d 1188, 1190 n.4 (10th Cir. 1992).

has established that the companies receiving separate rates in these investigations operate independently of each other and of government entities with respect to their exports of the subject merchandise. Thus, these respondents have been assigned rates based on their different cost and pricing structures. It would be a normal phenomenon that respondents with lower dumping margins would experience an increase in sales of the subject merchandise as a result of an increase in customers' demand for products with lower duty margins.

Final Determinations at 9167 (emphasis added).

Thus, Commerce actually considered and reasonably rejected Plaintiff's arguments. Consequently, Plaintiff's interests were not prejudiced if Commerce erred by rejecting the relevant information. Intercargo Insurance Co. v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the review of agency proceedings.").

Plaintiff's alternative argument, that its submission construed as "factual information" falls within the permissible time limits, is misplaced. Plaintiff contends that the rejected information falls within the exception allowing for submissions of factual information beyond a deadline only to "rebut, clarify, or correct factual information submitted by an interested party." 19 C.F.R. § 353.31(a)(2) (1997). Thus, according to Plaintiff, the rejected information must serve to "rebut, clarify, or correct" the PAI submitted by Respondents regarding the surrogate country data on January 10, 1997.

The Court finds, however, that Plaintiff's rejected factual information is wholly unrelated to Respondents' PAI. While Plaintiff's data discusses increasing margins in relation to prices in

the marketplace and accepted industry standards for reporting information, the Respondents' PAI is responsive to Commerce's request for more publicly available surrogate information and includes, *inter alia*, detailed financial reports from six Indian foundries for overhead, interest, depreciation and profit. See Letter from White & Case to Secretary of Commerce of 1/10/97, ITA Pub. Doc. 443 (responding to Commerce's request for additional PAI). Plaintiff's submission simply does not rebut, clarify or correct Respondents' PAI. Accordingly, the rejected portions of Plaintiff's Pre-Hearing Brief, even under this theory, remains untimely. Cf. Bowe-Passat v United States, 17 CIT 335, 338 (1993) ("[T]he burden on the party attempting to submit untimely information remains high indeed.").

Finally, Plaintiff's reasoning that its submitted information was timely under 19 U.S.C.§1516a(b)(2) (1994) is invalid. Plaintiff's contention that Breslow's "analysis" must be accepted as part of the record by Commerce simply by virtue of its having been submitted "during the course of the administrative proceeding" ignores the plain language of the regulations and the broad discretion of Commerce.[20] Plaintiff's theory, as noted by Defendant, see Defendant's Response at 15, would render inoperable Commerce's regulations establishing time limits for filing submissions.

---

[20]     Moreover, if Plaintiff's theory was well-grounded, Plaintiff's prior argument that Respondents's PAI should have been rejected as untimely would fail. See Plaintiff's Brief at 12 ("There was no justification for permitting Respondents to submit new factual information so late in the investigation . . . .")

Thus, the Court finds that Commerce's rejection of part of Plaintiff's Pre-Hearing Brief comports with the substantial evidence test and was made in accordance with law.

**E.**

**The ITC's Separate Rates Determination for Selected Respondents
Is Supported by Substantial Evidence And In Accordance With Law**

Under the broad authority delegated to it from Congress, Commerce has employed "a presumption of state control for exporters in a non-market economy." Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997). Under this presumption, all exporters receive one non-market economy country ("NME")[21] rate, or country-wide rate, unless an exporter can "'affirmatively demonstrate' its entitlement to a separate, company-specific margin by showing 'an absence of central government control, both in law and in fact, with respect to exports.'" Id. (citations omitted); see also Transcom, Inc. v. United States, 5 F. Supp.2d 984, 989 (1998).

To determine whether *de jure* government control exists, Commerce examines evidence of:

(1) An absence of restrictive stipulations associated with an individual exporter's business and export licenses;
(2) any legislative enactments decentralizing control of companies; or

---

[21]      A non-market economy country is statutorily defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A) (1994).

(3) any other formal measures by the government decentralizing control of companies.

Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China, 56 Fed. Reg. 20588, 20589 (May 6, 1991) (establishing Commerce's practice); see also Air Products and Chemicals, Inc., v. United States, 14 F. Supp.2d 737, 742 (CIT 1998) (citations omitted).

Evidence supporting *de facto* absence of government control includes:

(1) whether each exporter sets its own export prices independently of the government and other exporters;
(2) whether each exporter can keep the proceeds from its sales;
(3) whether the Respondent has authority to negotiate and sign contracts and other agreements; and
(4) whether the Respondent has autonomy from the government in making decisions regarding the selection of management.

Id.; Final Determination At Less Than Fair Value: Silicon Carbide from the People's Republic of China, 59 Fed. Reg. 22,585, 22,587 (1994).

In the Final Determinations at issue here, Commerce assigned separates rates to all but two of the participating Respondents that requested them.[22] Final Determinations, at 9161-62. First, Commerce found that all of the Respondents had provided sufficient documents and copies

_____

[22]     The participating Respondents who requested separate rates are: CAIEC/Laizhou CAPCO, CMC, Qingdao, Shenyang/Laizhou, Southwest, XCY, Xinjiang, Yantai, China North Industries Guangzhou Corp. ("CNIGC") and China North Industries Dalian Corp. ("Dalian"). Final Determinations, 62 Fed. Reg. at 9161-62.

of relevant PRC laws to establish an absence of *de jure* control.  Id. at 9161.  Commerce

explained that "[i]n prior cases, the Department has analyzed the laws which the respondents

have submitted in this record and found that they establish an absence of *de jure* control."  Id.

(citing Notice of Final Determination of Sales at Less Than Fair Value: Certain Partial-Extension

Steel Drawer Slides with Rollers From the People's Republic of China, 60 Fed. Reg. 54,472

(1995)).  Due to inconsistent implementation of the government enactments among different

jurisdictions in the PRC, however, Commerce accorded greater weight to its analysis of *de facto*

control.  Id.


Upon review of the evidence presented to it regarding *de facto* control, Commerce

determined that CAIEC/Laizhou CAPCO, CMC, Qingdao, Shenyang/Laizhou, Southwest, XCY,

Xinjiang, and Yantai demonstrated that:


> (1) [t]hey establish their own export prices;
> (2) they negotiate contracts, without guidance from any governmental entities or
> organizations;
> (3) they make their own personnel decisions; and
> (4) they retain the proceeds of their export sales, use profits according to their
> business needs and have the authority to sell their assets and to obtain loans.

Id.   Commerce additionally found, in the questionnaire responses, evidence that the relevant

Respondents engaged in company-specific pricing during the POI, indicating a lack of

coordination among exporters.  Id. at 9161-62.


As for CNIGC and Dalian, Commerce determined that they failed to rebut the

presumption that they operate under *de facto* government control.  The record evidence obtained

by Commerce demonstrated that CNIGC and Dalian still maintained ties to NORINCO.  Id. at

9166 ("[T]here is evidence on the record that NORINCO is controlled by the government.").

Accordingly, Commerce denied these two Respondents separate rates.   Id.


Plaintiff contests Commerce's assignment of separate rates.  Plaintiff's Brief at 17.

Plaintiff argues that the relevant Respondents failed to rebut the presumption of state control

both in law and in fact. Plaintiff contends that an analysis of the laws of the PRC alone is

insufficient to demonstrate the absence of *de jure* government control.  Id. at 18.  Instead,

Plaintiff points to some alleged restrictive state stipulations on individual companies' export

licenses to show government control.  Plaintiff's Brief at 19.  For example, Plaintiff contends that

some Respondents submitted evidence showing that they were "required to submit their annual

inspection reports, balance sheet, or profit/loss statement on a regular basis to the National

Industrial and Commercial Administration in order for the license to be renewed."  Id.  Also,

Plaintiff argues that the questionnaire response for Respondent Shenyang shows a legal

requirement to report the names of its board members to the Industry and Commercial

Administration Bureau.  Id.  This, Plaintiff contends, demonstrates government control over

management decisions.  Id.   Another Respondent, Southwest reported that a state authority will

conduct annual inspections of the companies.  Id.  Therefore, Plaintiff argues "[i]t is clear that

these inspections are a form of control of the government authority over the company

operations."  Id.  Finally, Plaintiff asserts that "[d]uring verification, the ITA should have

investigated further to find out specific details about these inspections."  Id.

With regard to an absence of *de facto* control, Plaintiff argues that Respondents failed to meet its burden. Specifically, Plaintiff indicates that several Respondents failed to provide minutes of employee meetings or employee evaluation forms, and Respondent Southwest only provided one pre-petition document. Id. at 21-22. Moreover, Plaintiff alleges that Respondents failed to disclose any relationship with the Ministry of Machinery Industry and the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC"). Id. This failure to disclose should have resulted in the denial of separate rates to those Respondents requesting separate rates. Id. at 23. Finally, Plaintiff contends that "the diversion of shipments of the subject merchandise between exporters observed after the ITA's preliminary determination in this investigation is strong indicia that the companies do not operate independently of each other . . . ." Id.

The Court finds that Commerce properly assigned separate dumping margins for the relevant Respondents. As a threshold matter, to the extent that Plaintiff insinuates that separate rates should not have been assigned because most of the Respondents were "owned by the people," its argument is unfounded. See Plaintiff's Brief at 18 (emphasizing that all Respondents affirmed ownership by the people). This Court has consistently upheld Commerce's methodology for determining government control, *de jure* and *de facto*, including a presumption of state control, as a proper administration of the antidumping statute. Writing Instrument Manufacturers Association, Pencil Section v. United States, 984 F. Supp. 629, 642 n.3 (CIT 1997) (citations omitted). Therefore, Commerce's conclusion that "ownership of a company by 'all the people' does not require the application of a single rate," is in accordance with the law. Final Determinations, 62 Fed Reg. at 9161.

Additionally, the evidence on the record supports Commerce's determination that the Respondents sufficiently proved an absence of *de jure* state control.   While it is true that business licenses containing restrictions may at times indicate control by the government, the issues raised by Plaintiff fail to raise any licensing restrictions which would indicate government control over exports.  The fact that some Respondents are required to submit annual inspection reports and balance sheets to demonstrate that they are not engaging in activities outside the scope of their licensed businesses does not establish *de jure* control by the government over export activities.  Instead, the Respondents are simply stating their compliance with the reporting laws of the PRC which require proof of operating within the scope of business in order to renew licenses.  See Air Products and Chemicals, 14 F. Supp.2d at 743 (affirming Commerce's finding of no *de jure* government control even though the company's business license restricts the scope of its business in the PRC).  If information reporting requirements necessarily negated free market status, few nations, including our own, could claim to be anything other than non-market economies.  See e.g., Securities Act of 1933, § 5, 15 U.S.C. § 77(e)(a) (1994) (prohibiting sale of securities unless a registration statement has been filed).

Moreover, in contrast to Plaintiff's assertions, an examination of Respondents' questionnaire responses actually reveals their independence from government control. In response to Commerce's questionnaire regarding its business licenses, Respondents Southwest, MMB Int'l., Inc., Yangtze Machinery Co., and Jiuyang Enterprise Corp. stated that "the license establishes that [a] company is an independent legal entity that is responsible for its own profits and losses."  Letter from Williams, Mullen, Christian & Dobbins to Secretary of

Commerce of 6/7/96, ITA Pub. Doc. 86 at 4. In addition, CAIEC noted that, other than the legal limitation to engage in the scope of its business activities, "[t]here are no other limitations imposed on Laizhou CAPCO or CAIEC, nor [sic] any entitlements granted to either company by this license." Letter from White & Case to Secretary of Commerce of 6/11/96, ITA Pub. Doc. 97 at 5. Because Commerce did not find any licensing restrictions, Commerce did not err by failing to investigate further the details of the inspections.

Commerce's finding of an absence of *de facto* control is also supported by substantial evidence. During verification, Commerce found nothing to contradict the claims of the Respondents. In contrast to Plaintiff's allegations that the record lacked the breadth of information required to show lack of governmental control, Commerce fully examined and verified sales documents, bank statements, company correspondence, loan documents, long-term investments and the articles of incorporation of those Respondents that it found qualified for separate rates. ITA Pub. Doc. 416-435, Administrative Record ("A.R.") Fiche Nos. 253-304 (verification exhibits). For Southwest, for example, Commerce evaluated the organization and corporate structure, and also examined "**how Southwest negotiates sales and how prices are set,**" and "sales terms, prices and other contract provisions for Southwest's pre-selected sales." Verification of Sales Response of Southwest, ITA Pub. Doc. 425 at 1-2 (emphasis in original). In order to ascertain that Southwest does not coordinate selling and pricing activities with other exporters and the China Chamber of Commerce, the ITA examined sales documentation, contracts, purchase orders and Southwest's sales accounting system. Id. at 3. Additionally, Commerce verifiers examined the process by which Southwest deals with convertible currency from export sales, including whether there are any restrictions on the use of foreign currency. Id.

Despite Plaintiff's contention that Southwest provided only one pre-petition[23] document evidencing lack of *de facto* governmental control, Plaintiff's Brief at 21-22, a review of the record reveals that Southwest provided ample pre-petition documentation. In addition to the "Circular of Independent Financial Relation Between Headquarters and the Branches" with an attached "Debit Transfer Accounts Notice" issued January 17, 1987, Commerce examined a December 30, 1992 announcement for the change in names from China National Technical Import & Export Corp., Xinan Company to Southwest Technical Import & Export Corp., 1995 financial statements, a "1995 Proposed Plan from the General Manager," a "1995 Conference Resolution" and a document entitled "Operating Indexes and Check -Up System for 1995." Id. at 2-4. Also, in order to explain its sales process, Southwest provided a substantial amount of 1995 correspondence. Id. at 5.[24]

Plaintiff also argues that the failure by MOFTEC and all Respondents to provide documentary evidence of their relationship demonstrates a failure to prove an absence of governmental control and should have resulted in use of facts available. Plaintiff's Brief at 22.

---

[23]     Plaintiff filed its petition on March 7, 1996. Petition from Porter Wright Morris & Arthur to Secretary of Commerce of 3/7/96, ITA Pub. Doc. 1.

[24]     The Court notes that Plaintiff's reliance on Tianjin Machinery Import & Export Corp. v. United States, 16 CIT 931, 806 F. Supp. 1008 (1992) is inapposite. The Court in Tianjin, found that the record lacked evidence of any business licenses, sales correspondence, bank records and corporate credentials. Tianjin, 16 CIT at 936, 806 F. Supp. at 1014. In this case, Commerce found evidence of all such documentation.

The record indicates that Commerce met with the Ministry of Machinery Industry in order "to discuss the relationship between the Ministry of Machinery Industry and China North Industries Corp. (National NORINCO) and the Ministry's relationship with CNIGC and Dalian. Memorandum from Brian Smith to Gary Taverman of 1/16/97, ITA Pub. Doc. 458. While Commerce noted that Ministry officials did not provide some requested documentation, Commerce, in the end, denied separate rates for CNIGC and Dalian. Final Determinations at 9162. As for the other Respondents, Plaintiff points to no evidence to demonstrate that Respondents "withheld relevant and material information."[25] Accordingly, Commerce's finding that there was "no evidence that these respondents are controlled by MOFTEC or the Ministry of Machinery Industry, or any level of the PRC government," Final Determinations at 9167, is reasonably supported by the record.

---

[25]     The evidence proffered by Plaintiff to demonstrate that all Respondents withheld information is inadequate. Plaintiff asserts that when asked under the questionnaire section entitled "Separate Rates" to describe "[y]our company's relationship with the national, provincial, and local governments, including ministries or offices of those governments," the Respondents receiving separate rates answered that they have ["no relationship with any level of the PRC government."] See e.g., A.R. Fiche No. 102, at 000008-000009 (Section A Questionnaire Response of Respondent CMC); see also, A.R. Fiche Nos. 103-105 (Section A Questionnaire Responses of Respondents, Yantai and Qingdao). Plaintiff argues that Respondents withheld information about their relationship with the government because Ministry of Machinery Industry officials told the ITA that the Ministry meets with representatives of manufacturers three to four times a year and MOFTEC handles dealings with trading companies. Plaintiff's Brief at 22. Commerce, however, found no evidence of control by the PRC government and Plaintiff only points to a memo in the record documenting Commerce's visitation with the Ministry of Machinery Industry and MOFTEC to discuss Dalian and CNIGC. ITA Pub. Doc. 458. It is clear that for purposes of corporate control, Respondents answered the questionnaires correctly and Commerce, in conjunction with other record evidence, reasonably agreed that no governmental control is involved. As for a relationship of any sort with the government, Respondent CMC, for example acknowledges that it "reports the results of its senior management selection to [MOFTEC] for registration purposes only." A.R. Fiche No. 102, at 000015.

As for Plaintiff's concern regarding the diversion of shipments, Commerce properly rejected Plaintiff's "expert testimony" as the untimely submission of factual information. However, as noted earlier, Commerce reasonably found that no concern for massive diversion of shipments between exporters existed since "the Department has established that the companies receiving separate rates in these investigations operate independently of each other and of government entities with respect to their exports of the subject merchandise." Id.

Thus, despite Plaintiff's arguments, the Court finds that there is sufficient evidence on the record to support Commerce's determination of an absence of *de jure* and *de facto* governmental control for the relevant Respondents.

**F.**

**The ITA Determination To Assign Selected Respondents' Average Margins
To Non-Selected Respondents Is Supported By Substantial Evidence
And In Accordance With Law.**

In general, the antidumping law requires Commerce to calculate the estimated weighted average dumping margin for each exporter and producer individually investigated. 19 U.S.C. § 1673d(c)(1)(B)(i)(I) (1994); 19 U.S.C. § 1677f-1(c)(1) (1994). As an exception, however, 19 U.S.C. § 1677f-1 expressly permits the use of sampling and averaging.[26] The relevant section

---

[26]     19 U.S.C. § 1677f-1(a) (1994) states, in pertinent part, that "the administering authority may- (1) use averaging and statistically valid samples, if there is a significant volume of sales of the subject merchandise or a significant number or types of products, and (2) decline to take into

provides that:

> If it is not practicable to make individual weighted average dumping margin determinations . . . because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to-
>
>> (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or
>>
>> (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

19 U.S.C. § 1677f-1(c)(2) (1994).

This section was added by the URAA, and remains consistent with the broad authority granted to Commerce in selecting sampling methodologies. See Statement of Administrative Action Accompanying the URAA, H.R. Doc. No.103-316, at 872 (1994) ("SAA"), reprinted in 1994 U.S.C.C.A.N. 4040, 4200-01;[27] Koyo Seiko Co., Ltd. v. United States, 20 F.3d 1156, 1158 (Fed. Cir. 1994) (granting discretion to Commerce in deciding when to average prices); Federal-Mogul Corp. v. United States, 918 F. Supp. 386, 403-04 (CIT 1996) (granting broad discretion in sample selection methodology).

---

account adjustments which are insignificant in relation to the price or value of the merchandise."

[27]     19 U.S.C. § 3512(d) (1994) provides that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application."

In such cases, 19 U.S.C. § 1673d(c)(1)(B)(i)(II) (1994) specifies that Commerce shall "determine, in accordance with paragraph (5), the estimated all-others rate for all exporters and producers not individually investigated . . . ."  Paragraph 5 of that section establishes the method for determining the estimated all-others rate.  "[T]he estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined . . . on the basis of facts available."  19 U.S.C. § 1673d(c)(5)(A) (1994).[28]  However, "[i]f the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins," or based entirely on facts available, "the administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated."  19 U.S.C. § 1673d(c)(5)(B) (1994).

With exporters from a NME, however, Commerce's practice is to presume all exporters are under the control of the central government until they affirmatively demonstrate a *de jure* and *de facto* absence of government control.  This approach was first announced in Final Determination of Sales at Less Than Fair Value; Sparklers from the People's Republic of China,

---

[28]     Under pre-URAA practice, Commerce included margins determined on the basis of facts otherwise available (formerly "best information available") when calculating the all-others rate. SAA at 873, 1994 U.S.C.C.A.N. at 4201.

56 Fed. Reg. 20,588, 20,589 (1991) and has been consistently upheld by this Court and the

Federal Circuit.  Air Products and Chemicals, 14 F. Supp.2d at 741-42; Sigma Corp. v. United

States, 117 F.3d 1401, 1405 (Fed. Cir. 1997).   Commerce investigates each exporter

individually, including those requesting separate rates, based on the "presumption that each is

part of a single entity whose pricing practices are controlled by the government."  Zalok Memo,

ITA Pub. Doc. 170 at 3.  Those exporters who do not respond or fail to prove absence of *de*

*jure/de facto* control are assigned the country-wide rate.  Therefore, a NME exporter normally

receives one of two rates:  either the separate rate for which it qualified or a country-wide rate.

Transcom, 5 F. Supp.2d at 990.  This approach obviates the need for an "all-others" rate

calculation.


        The case at bar involves exports from a NME.  Commerce assigned dumping margins to

three categories of Respondents:

> (1)     Respondents proving an absence of government control received separate
>         *company-specific rates;*
>
> (2)     Respondents responding fully to questionnaires but not investigated
>         received averaged non-adverse "all others" rates; and
>
> (3)     Respondents not qualifying for separate rates or not responding to questionnaires
>         received the China-wide rate based on adverse facts available.


See Final Determinations.


        Initially, Commerce anticipated receiving twenty-six complete responses to

questionnaires.[29]  Zalok Memo, ITA Pub. Doc. 170 at 1.  Because of the administrative burden

associated with investigating twenty-six companies, Commerce decided to limit the number of

investigated Respondents to seven in the brake rotors investigation[30] and five in the drum

investigations.[31]  Id. at 4 ("Due to the administrative burdens and the limited resources available

to the Department, we recommend limiting our complete analysis in these

cases . . . .").  Consistent with the statutory provisions, Commerce selected as Respondents to

investigate those Respondents with the largest sales volumes.  Id.  Those Respondents not

selected also submitted full responses to the questionnaires and requested separate company-

specific rates.  Those Respondents that did not submit a questionnaire response or could not

qualify for separate rates were assigned a China-wide rate based on adverse facts available.  Final

Determinations at 9162.


        After investigating the selected Respondents and finding all but two qualified for separate

rates, Commerce concluded that an averaged margin based on the selected Respondents should

be assigned to the fully cooperative but uninvestigated Respondents.  Id. at 9173-74.  Commerce

reasoned that it would be inappropriate to assign a rate based on adverse "facts available" that

---

[29]     Sixteen (16) responses in the rotor investigation and ten (10) responses from the drum
investigation.  Zalok Memo, ITA Pub. Doc. 170 at 1.

[30]     Those Respondents are: Dalian Norinco, China National Automotive I/E Corp. and its
U.S. subsidiaries, Laizhou CAPCO and CAPCO USA, Shenyang Honbase Machinery Co., Ltd.,
Yantai Import & Export, Guangzhou Norinco, Southwest Technical Import & Export Corp. and
Xinjiang Machinery Import & Export Corp.  Zalok Memo, ITA Pub. Doc. 170 at  4.

[31]     Those Respondents are: Yantai Import & Export, Guangzhou Norinco, Qingdao Metal &
Minerals, XCY, and China Machinery Corp.  Zalok Memo, ITA Pub. Doc. 170 at 4.

would also apply to PRC exporters who refused to cooperate.  Id.  at 9173-74.

For brake rotor non-selected Respondents,[32] Commerce "assigned . . .  a weighted-average dumping margin based on the calculated margins of the selected brake rotors respondents, excluding margins which were zero, de minimis or based on facts available."  Id. at 9174.  For brake drum non-selected Respondents,[33] Commerce "assigned . . . a rate which is the simple average of the dumping margins determined for the exporters and producers individually investigated."  Id.  Commerce did not include selected brake drum Respondent, CNIGC's rate based on facts available in the calculation because Commerce does "not consider that a weighted-average which includes that company's adverse facts available rate is reasonably reflective of potential dumping margins for cooperative non-investigated exporters or producers who submitted full questionnaire responses."  Id. at 9173-74.[34]  Commerce's  methodology for calculating margins for these non-selected Respondents was based on the statutory provisions outlining the all-others rate calculation found in 19 U.S.C. § 1673d(c)(5) (1994).  Id. at 9173.

---

[32]      These Respondents are:  Hebei Metals and Machinery Import & Export Corp., Jilin Provincial Machinery & Equipment Import & Export Corp., Jiuyang Enterprise Corp., Longjing Walking Tractor Works Foreign Trade Import & Export Corp., Qingdao Metals, Minerals & Machinery Import & Export Corp., Shanxi Machinery and Equipment Import & Export Corp., Xianghe Zichen Casting Corp. and Yenhere Corp.  Final Determinations at 9174.

[33]      These Respondents are:  CAIEC/Laizhou CAPCO, Hebei Metals and Machinery Import & Export Corp., Jiuyang Enterprise Corp., Longjing Walking Tractor Works Foreign Trade Import & Export Corp. and Shanxi Machinery and Equipment Import & Export Corp. Final Determinations at 9173.

[34]      As discussed earlier, CNIGC, a selected Respondent, requested a separate rate but did not carry its burden of proving an absence of state control.  Accordingly, Commerce assigned it the China-wide rate.  Final Determinations at 9166.

Plaintiff argues that Commerce should have assigned the non-investigated Respondents

the China-wide rate of 86.02% for drums and 43.32% for rotors.  Plaintiff's Brief at 24.

Specifically, Plaintiff contends that since the non-selected Respondents were never verified by

Commerce, they should have received the China-wide rate.   Id. at 25 ("This procedure of not

verifying information from a non-selected Respondent is not in accordance with law.").  In

addition, Plaintiff argues that the analogous use of 19 U.S.C. § 1673d(c)(5) is not appropriate

since the statute deals with the calculation of an "all others" rate in market economy cases only.

Plaintiff's Reply Brief at 12.  Moreover, it claims, the "assignment of non-adverse, average rates

to the non selected respondent is not a reasonable interpretation of 19 U.S.C. § 1673d(c)(5),

especially for the ITA's assignment of the simple average rate for drum non selected

Respondents."  Id.


Commerce's assignment of an averaged non-adverse margin to the non-selected

Respondents is supported by substantial evidence and in accordance with law.  As a threshold

matter, Commerce's decision to resort to averaging due to the administrative burden is in

accordance with law.[35]  "The purpose of 19 U.S.C. § 1677f-1 is to permit Commerce to use

sampling methodologies when necessary due to the volume of sales involved.  The legislative

history shows that the purpose of § 1677f-1 is to '"to reduce the costs and administrative burden

on the Department of Commerce of determining dumping margins . . . . '" Federal-Mogul Corp.,

918 F. Supp. at 404 (quoting H.R. Rep. 98-725 (1984), reprinted in 1984 U.S.C.C.A.N. 4910,

---

[35]     Commerce discussed the large number of exporters as well as its current staffing and
office caseload restrictions.  See Zalok Memo, ITA Pub. Doc. 170 at 3.

5173).  Commerce did not err by not verifying the non-selected Respondents.[36]


The second issue raised by Plaintiff is whether Commerce's assignment of an "all others" average rate to NME exporters, who were not required to prove their entitlement to separate rates, comports with substantial evidence and is in accordance with law.  Plaintiff concedes that the "ITA has discretion to establish the estimated 'all others' rate for exports and producers not individually investigated," but argues "that discretion is limited by the concept of reasonableness . . . ."  Plaintiff's Reply Brief at 11.  Indeed, Chevron teaches that "if the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984).  Where the agency's interpretation of a statute represents a reasonable accommodation of manifestly competing interests, it is entitled to deference.  Id. at 865.  "Since Commerce administers the trade laws and its implementing regulations, it is entitled to deference in its reasonable interpretations of those laws and regulations."  Melex USA, Inc. v. United States, 19 CIT 1130, 1133, 899 F. Supp. 632, 635 (1995) (citing PPG Industries v. United States, 13 CIT 297, 299, 712 F. Supp. 195, 198 (1989), aff'd, 978 F.2d 1232 (Fed. Cir. 1992); compare with Haggar Apparel Co. v. United States, 938 F.

---

[36]     As Defendant notes, Commerce never used unverified information to calculate the margins for the non-selected Respondents.  The margins used were based upon the verified data of the selected Respondents.

In addition, if Plaintiff's argument that the ITA erred by failing to verify all the non-selected Respondents' information was valid, the sampling/averaging statutes would have no purpose.  Such a result is to be avoided, if possible, under standard rules of statutory construction.  See Norman J. Singer, 2B Sutherland Stat. Const., §51.02 (5th ed. 1992).

Supp. 868 (CIT 1996) aff'd, 127 F.3d 1460 (Fed. Cir. 1997) (no Chevron deference in customs

cases), cert. granted, 119 S.Ct. 30 (1998).


The statute's silence mandates a reasonableness analysis of statutory interpretation of

assignment of an "all-others" averaged rate to non-selected NME Respondents.  As an initial

matter the Court finds without support Plaintiff's argument that 19 U.S.C. § 1673d(c)(5) (1994)

only applies to market economies.  "[T]he amended provisions [of 19 U.S.C. §§

1671d(d)(1)(B)(i) and 1671d(c)(1)] nonetheless indicate Congressional support for the 'all

others' rate without distinction for NME or non-NME contexts."   UCF America Inc. v United

States, 919 F. Supp. 435, 441 (CIT 1996).  Indeed, the legislative history makes no such mention

of any distinction.


Although there are no cases from this Court directly on point,[37]  Commerce in Notice of

---

[37]      While not in direct conflict, the Court notes the arguable tension created by its holding
here with the Court's reasoning in Transcom v United States, 5 F. Supp.2d (CIT 1998).  In
Transcom, the Court found reasonable Commerce's decision to "assign a country-specific rate to
a NME company that was not individually notified by Commerce, or its government, that its
merchandise may be covered by a pending antidumping investigation." Id. at 989.  After relying
on the NME presumption enunciated above, the Court stated that:

> [B]ecause all exporters or producers, at least in theory, have been reviewed, the
> calculation of an all others rate is unnecessary.  While this procedure is admittedly
> at odds with the letter of Commerce's own regulations requiring the review, upon
> request, of specific individual producers, muddling the CAFC's endorsement of
> the NME presumption would undermine Commerce's administration of the
> dumping law on NME entities, a task that is inherently difficult, and render the
> NME presumption impotent."

Id. at 990.  The case at bar, however, is distinguishable.  Transcom involved solely the issue of
notice in NME cases.  Here, the Respondents received notice of the pending investigation, and
complied fully with all of Commerce's requests for information.  The Respondents, thus should

Preliminary Determination of Sales at Less Than Fair Value: Honey from the People's Republic

of China, 60 Fed. Reg. 14725, 14729-30 (March 20, 1995) ("Honey") squarely addressed this

issue.  See also Notice of Preliminary Determination of Sales at Less Than Fair Value and

Postponement of Final Determination: Certain Preserved Mushrooms from the People's Republic

of China, 63 Fed Reg. 41794, 41797-98 (Aug. 5, 1998).  Commerce, in Honey, first confronted

the situation where administrative constraints prevented it from fully investigating NME

Respondents who complied fully with questionnaire requests.  Prior to that determination,

Commerce, generally, had been able to individually investigate all producers/exporters because

of the small number of Respondents involved.  See ITA Pub. Doc. 170 at 3.  Given this unique

situation, Commerce reasoned:

> Because it would not be appropriate for the Department to refuse to consider an
> affirmative documented request for an examination of whether these companies
> were independent of any non-respondent firms and then assign to the cooperative
> firms the rate for the noncooperative firms, which in this case is an adverse
> margin based on best information available, the Department has assigned a special
> single rate for these firms.

60 Fed Reg. at 14729-30.


The ITA's reasoning in Honey has the weight of fairness and common sense.  It would be

inequitable if Commerce were to assign an adverse facts available rate to these Respondents.

Cf., Nat'l. Knitwear & Sportswear Assoc. v. United States, 15 CIT 548, 558, 779 F. Supp. 1364,

1372-73 (1991) (holding that the application of a punitive, or even quasi-punitive, rate to

innocent parties would be contrary to the intent that the antidumping law be remedial).

---

have been fully verified and given an opportunity to demonstrate lack of government control, but
could not due to Commerce's own administrative constraints, a situation for which there is a
clearly defined statutory exception.

Commerce's approach also comports with purpose of the new statutory scheme under the URAA which is "designed to prevent the unrestrained use of facts available as to a firm which makes its best effort to cooperate with the Department." Borden, 4 F. Supp.2d at 1245. Commerce, faced with an inability to investigate all cooperating Respondents, reasonably devised a methodology for calculating a fair rate.

Moreover, the calculation of the "all others rate" applied by Commerce to the non-selected Respondents is statutorily defined in 19 U.S.C. § 1673d(c)(5) (1994). Commerce's calculation of the rate for non-selected brake rotors is reasonably based on Section 1673d(c)(5)(A)'s mandate to use the weighted average of the estimated weighted average dumping margins established for exporters individually investigated, excluding any zero and *de minimis* margins and any margins determined by facts available.

Similarly, Commerce's calculation of the non-selected brake drums rate is reasonably based on Section 1673d(c)(5)(B) which gives Commerce the authority to use any reasonable method where the estimated weighted average dumping margins for all exporters individually investigated are zero or *de minimis* or based entirely on facts available. While the statute also suggests the use of "averaging the estimated weighted average dumping margins determined for the exporters individually investigated" in these situations, the SAA specifies that if this approach "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods." SAA at 873, 1994 U.S.C.C.A.N. at 4201.

Accordingly, the Court finds Commerce's assignment to the non-investigated brake drums Respondents of a rate which is the simple average of the dumping margins determined for the exporters individually investigated is supported by substantial evidence. Since the rates in this case for all the selected brake drums Respondents were either zero or based entirely on facts available, Commerce had a reasonable basis to assign the non-selected Respondent rates. In accordance with the SAA's mandate not to use reasonably unreflective data, Commerce did not include selected brake drum Respondent CNIGC's rate, based on facts available in the calculation. See Nat'l. Knitwear & Sportswear Assoc., 15 CIT at 558-59, 779 F. Supp. at 1372-73 (affirming Commerce's exclusion of BIA rates from "all others" rate where rates are not representative of pricing practices).

Thus the Court finds reasonable Commerce's determination to assign the non-investigated Respondents a non-adverse "all others" rate.

**G.**

**The ITA's Critical Circumstances Determination Is Supported
By Substantial Evidence and In Accordance With Law.**

Generally, antidumping duties are imposed on entries of merchandise made on or after the date on which the Secretary first imposes provisional measures -- usually the date on which notice of an affirmative preliminary determination is published in the Federal Register. 19 CFR § 351.206 (1998). Commerce's regulations, however, additionally allow a petitioner to allege the existence of critical circumstances in its petition. If critical circumstances are found to exist, duties may be imposed retroactively on merchandise entered up to 90 days before the imposition

of provisional measures.  See 19 U.S.C. 1673b(e) (1994).[38]

> Where a party alleges critical circumstances, Commerce must determine whether:
>
>> (A)(I) there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere of the subject merchandise, or
>>
>> (ii) the person by whom or for whose account, the merchandise was imported knew or should have known that its exporter was selling the subject merchandise at less than fair value and that there would be material injury by reason of such sales, and
>>
>> (B) there have been massive imports of the subject merchandise over a relatively short period.

19 U.S.C. § 1673d(a)(3) (1994) (emphasis added). [39]

In this case, Commerce conducted its analysis under Section 1673d(a)(3)(A)(ii) (1994)

because there is no history of dumping and material injury by reason of dumped imports for

either brake drums or rotors.  Final Determinations at 9164.   Commerce concluded that it could

not find importer knowledge of material injury as to the brake drums,[40] and therefore, did not

_____

[38]     This provision is "designed to address situations where imports have surged as a result of the initiation of an antidumping or countervailing duty investigation, as exporters and importers seek to increase shipments of the merchandise subject to investigation into the importing country before an antidumping or countervailing duty order is imposed."  S. Rep. No.103-412 (1994).

[39]     Under the pre-URAA practice, critical circumstances existed if Commerce found massive imports of the subject merchandise over a relatively short period of time prior to the suspension of liquidation and (1) there is either a history of dumping or (2) the importer knew or should have known that the exporter was selling the merchandise at less than fair value.  19 U.S.C. § 1673d(a)(3) (1988).  Commerce did not require the "likelihood of material injury" prong.

[40]     The URAA and SAA are silent as to how Commerce should make a finding of knowledge of material injury.  Therefore, Commerce is afforded reasonable discretion in

examine the other critical circumstances criteria. Id. at 9165. Consequently, Commerce made a

negative critical circumstances determination for brake drums.

––––––––––––––––––––––––

formulating a methodology. Chevron, 467 U.S. at 843.

        In order to determine importer knowledge of material injury, Commerce looks to the
preliminary finding of the International Trade Commission (ITC). Where a preliminary ITC
finding of present material injury is made, the ITA concludes that an exporter knew or should
have known that such imports would cause injury. Final Determination of Sales at Less Than
Fair Value: Certain Cut-to-Length Carbon Steel Plate from the People's Republic of China, 62
Fed. Reg. 61,964, 61,967 (1997). In contrast, if the ITC makes solely a preliminary threat of
material injury finding, Commerce concluded in the Final Determinations at issue that it is not
reasonable to conclude that an importer knew or should have known that its imports would cause
material injury." Id. (citing Decision Memorandum Regarding Imputed Knowledge of Material
Injury at 4, Administrative Record, Fiche No. 88, Frame No. 1 ("it would be difficult to justify a
presumption of knowledge")). Subsequent Commerce Determinations, however, have clarified
that although "[Commerce] would normally not find knowledge of injury" with only a
preliminary threat finding, where the "magnitude of the margins and increase in imports are so
great . . . the importer knew or should have known that these sales of subject merchandise to the
U.S. would cause material injury." Notice of Final Determination of Sales Than Fair Value:
Certain Cut-To-Length Carbon Steel Plate from the Russian Federation, 62 Fed. Reg. 61,787,
61,793 (1997); Preliminary Determination of Sales at Less Than Fair Value; Certain Cut-to-
Length Carbon Steel Plate from Ukraine, 62 Fed. Reg. 31,958, 31,962 (1997) (finding knowledge
of material injury with only threat of material injury finding when coupled with 45% increase in
volume and 99.59% and 176.76% margins).

        This Court has yet to rule on the reasonableness of Commerce's methodology in
determining importer knowledge of material injury, and the issue is not presented in this case.
Commerce's approach seems reasonable, however, because the test satisfies the legislative
mandate for importer knowledge. "[T]he general public, including importers, is deemed to have
notice of th[e] [material injury] finding[s] as published in the Federal Register." Final
Determination of Sales at Less Than Fair Value; Certain Cut-to- Length Carbon Steel Plate from
the People's Republic of China, 62 Fed. Reg. 61,964, 61,967 (1997).

        Although there is no evidence in the record indicating that after the ITC's preliminary
threat of material injury finding concerning brake drums, Commerce additionally examined the
magnitude of the margins and volume of imports under its articulated standard, Commerce would
not have found critical circumstances as no importer knowledge of dumping existed "[s]ince the
company-specific margins in the final determinations for brake drums . . . are below 15 percent
for [constructed export price] sales and below 25 percent for [export price] sales." Final
Determinations at 9165.

As for brake rotors, Commerce concluded that no critical circumstances existed for the selected Respondents because it could not find importer knowledge of dumping as to all the Respondents except Southwest.  Id.[41]  Commerce, however, did not make a critical circumstances determination as to Southwest because its imports had not been massive.  Id.

Similarly, Commerce declined to find critical circumstances for the non-selected but fully cooperating Respondents.  Using the same rationale applied to the assignment of non-adverse margins, Commerce concluded that it is "inappropriate to find critical circumstances with respect to respondents whose individual data have not been analyzed due to the Department's own administrative constraints."  Id.[42]

Plaintiff contests Commerce's failure to request shipment information from the non-investigated Respondents to determine and analyze any existence of massive imports.  In the alternative, Plaintiff argues that "if full investigation of non selected respondents is not possible, critical circumstance should be found to exist based on China wide rates and on 'facts available.'"  Plaintiff's Brief at 27 (emphasis in original).

---

[41]       Commerce's normal practice is that it will impute knowledge of material injury where the margins are above 15% for Constructed Export Price ("CEP") sales and above 25% for Exported Price ("EP") sales. Final Determination of Sales at Less Than Fair Value: Certain Cut Length Carbon Steel Plate from the People's Republic of China, 62 Fed. Reg. 61,964 (1997); Preliminary Critical Circumstances Determination:  Honey from the People's Republic of China, 60 Fed. Reg. 29,824 (1995); Final Determination of Sales at Less Than Fair Value; Silicon Metal from China, 56 Fed. Reg. 18,570 (1991).

[42]       In contrast, Commerce imputed knowledge of dumping, and of material injury, and presumed massive imports of brake rotors, to the China-wide entity based on facts available. Final Determinations at 9165.

The Court rejects Plaintiff's argument. Commerce did not request shipment information from the non-selected Respondents because it did not have the administrative support to analyze or review it. See Notice of Preliminary Critical Circumstances Determination: Honey from the People's Republic of China, 60 Fed. Reg. 29,824, 29,825 (1995). More importantly, however, since the Court has affirmed Commerce's decision to assign a non-adverse "all others" rate to non-investigated Respondents, Commerce could not impute knowledge of dumping to these Respondents based on the margins calculated for them. These margins were less than 15% for CEP sales and 25% for EP sales. Accordingly, Commerce's decision not to request shipment information was in accordance with law since Commerce did not need to determine if the third criterion, massive imports, existed. Preliminary Determinations of Critical Circumstances; Brake Drums and Brake Rotors from the People's Republic of China, 61 Fed. Reg. 55,269, 55,270 (1996) ("[I]t is not necessary to consider whether there have been massive imports since we found there was no history of dumping or importer knowledge.").

Moreover, Plaintiff's authority for the proposition that Commerce should use facts otherwise available to calculate critical circumstances is inapposite. Plaintiff cites to Saha Thai Pipe Steel Co., Ltd. v. United States, 17 CIT 727, 828 F. Supp. 57 (1993), for the proposition that "this Court has ruled that there is a preference for the employment of country wide rates by the agency when faced with administrative constraints." Plaintiff's Brief at 27-28. While it is true that the pre-URAA statute, 19 U.S.C. § 1671e(a)(2) (1988),[43] relied on by the Court in Saha

---

[43]     19 U.S.C. § 1671e(a)(2) (1988) provides that the administering authority shall publish a countervailing duty order which "shall presumptively apply to all merchandise of such class or kind exported from the country investigated . . . ." Commerce may, however, determine a

<u>Thai Pipe Steel Corp.</u>, 828 F. Supp. at 736, and related case law,[44] created a presumption in favor of applying country-wide countervailing duty rates, the statute only applies to the assessment of countervailing duties. <u>There is no parallel antidumping statute</u>.[45] As the Federal Circuit noted, in the context of 19 U.S.C. § 1671e(a)(2) (1988), "'[u]nlike the antidumping law, which is directed to company-specific activity, the countervailing duty law is directed at government or government-sponsored activity.'" <u>Ipsco</u>, 899 F.2d at 1197 (citation omitted).

In addition, Congress has repealed the statute which created a presumption for country-wide rates and which was relied upon in the cases cited by Plaintiff. The URAA "designates § 1671e(a)(3) as § 1671e(a)(2), and strikes former § 1671e(a)(2)." <u>Geneva Steel</u>, 914 F. Supp. at 616, n.72. The legislative history specifically states that "Section 265 complements section 265 by eliminating the current presumption in section 706(a) of the 1930 Tariff Act favoring country-wide subsidy rates." S. Rep. No. 103-412, at 242 (1994).

Plaintiff also cites to <u>Usinor Sacilor v. United States</u>, 907 F. Supp. 426 (CIT 1995) for the holding that "this Court has recognized the applicability of neutral BIA even when cooperative respondent substantially complies with information requests and where any deficiencies arise

---

company-specific rate where either (A) a significant differential between companies receiving subsidy benefits exists or (B) a State-owned enterprise is involved.

[44]     <u>Kajaria Iron Castings Pvt. Ltd v. United States</u>, 156 F.3d 1163, 1177 (Fed. Cir. 1998); <u>Ipsco, Inc. v. United States</u>, 899 F.2d 1192, 1197 (Fed. Cir. 1990); <u>Geneva Steel v. United States</u>, 914 F. Supp. 563, 618-19 (CIT 1996).

[45]     <u>Compare</u> 19 U.S.C. 1671e(a) (Assessment of Duty: Publication of Countervailing Duty order) <u>with</u> 19 U.S.C. 1673e(a) (Assessment of Duty: Publication of Antidumping Duty).

from factors beyond respondents [sic] control."  Plaintiff's Brief at 28.  That case does not

support Plaintiff's argument.  Plaintiff calls for the application of the China-wide rate which, as

noted by Defendant-Intervenors, is based on an adverse facts available rate.  Usinor Sacilor

explicitly rejected usage of this type for a Respondent who had substantially complied with

Commerce's data request.  907 F. Supp. at 429 ("[T]he court finds that Commerce's inclusion of

the highest non-aberrant margin in the weighted average calculated margin is improper.").


        The Court finds Commerce's determination finding no critical circumstances as to the

non-investigated Respondents is supported by substantial evidence and in accordance with law.


**H.**

**ITA Selection Of Surrogate Values From India**


        Commerce calculates an antidumping margin by comparing an imported product's price

in the United States to the normal value of comparable merchandise.   19 U.S.C. § 1677(35)(A)

(1994).  Normal value typically equals the domestic price of the product in the exporting country.

19 U.S.C. § 1677b(a)(1)(B) (1994).   When the subject merchandise, however, is exported from a

NME, the domestic sales may not be reliable indicators of market value.   In such instances,

Commerce determines normal value by 1) isolating each factor of production process in the

NME country, 2) choosing a surrogate market economy country at a comparable level of

economic development that produces comparable merchandise, 3) assigning a value to each

factor of production equal to its cost in the surrogate country and 4) adding to those values an

estimated amount for profit and general expenses.  19 U.S.C. § 1677b(c) (1994); <u>Air Products</u>

<u>and Chemicals</u>, 14 F. Supp.2d at 745.   "[T]he valuation of the factors of production shall be

based on the best available information[46] regarding the values of such factors in a market

economy or countries considered to be appropriate. . . ."  19 U.S.C. § 1677b(c)(1) (1994).


 In response to Commerce's request for additional PAI , Respondents submitted

information from six surrogate Indian producers on overhead, interest, depreciation and profit.

---

[46]     The Court notes that the term "best available information" ("BAI") is distinguished from
the term "best information available"("BIA").  <u>Union Camp Corp.</u>, 941 F. Supp. at 116.   A
number of cases, however, in dicta, describe the statute's mandate to use BAI as requiring the use
of "best information available."  <u>See</u> <u>e.g.</u>, <u>Olympia Industrial, Inc. v. United States</u>, 7 F. Supp.2d
997, 1000 (CIT 1998) ("From the statute, it is clear that Commerce must identify and use the best
information available when it values the factors of production.");  <u>Nation Ford Chem. Co. v.
United States</u>, 985 F. Supp. 133, 134 (CIT 1997), <u>aff'd</u>, -- F.3d –, 1999 WL 50475 (Fed. Cir.
1999) ("The purpose of the procedure is to construct the product's price as it would have ben if
the NME country has been a market economy, using the best information available regarding
surrogate values.").

     19 U.S.C. 1677b(c)(1)'s mandate to use best available information speaks to the quality of
the information relied upon by Commerce when choosing valuation data in relation to a NME
and fulfills the statutory purpose to facilitate the determination of dumping margins as accurately
as possible. <u>See</u> <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

     Commerce uses best information available "whenever a party or any other person refuses
or is unable to produce information requested in a timely manner and in the form required, or
otherwise significantly impedes an investigation," 19 U.S.C. § 1677e(c) (1988), or if Commerce
is unable to verify the accuracy of the information submitted, 19 U.S.C. § 1677e(b) (1988).
Additionally, Commerce's regulations further specify that it will use BIA when the party being
investigated does not give a complete, accurate, and timely response to Commerce's request for
factual information. 19 C.F.R. § 353.37(a)(1) (1995).

     While the terminology may have caused confusion, the Court notes that similar issues
should not arise in post-URAA cases as the BIA terminology has now been denominated "facts
otherwise available."

Letter from White & Case to Secretary of Commerce of 1/10/97, ITA Pub. Doc.443; A.R., Fiche

Nos. 69-73.  In calculating normal value, Commerce used the Indian factory overhead costs

provided by Respondents as a surrogate for Chinese producers' overhead.  In the Final

Determinations, Commerce explained that it did not use data from the Indian producer, Shivaji,

as it had in the Preliminary Determinations, because "publicly available information, along with

information from the U.S. consulate in India, establishes that Shivaji did not produce subject

merchandise during the POI."  Final Determinations at 9168.


Plaintiff argues that it should have had an opportunity to respond to Respondents' PAI

submission.  Plaintiff's Brief at 29.  Plaintiff also argues that the ITA erred by failing to verify

this "PAPI."[47]  Id.  Thus, Plaintiff contends that the ITA's reliance on this information is not

supported by substantial evidence because the "ITA does not have the discretion to rely on

evidence that is not a reasonable alternative."  Id.  Finally, Plaintiff argues that the ITA should

have used Indian producer financial statements from Shivaji and Rico Auto Industries Limited

("Rico") as it did in the preliminary determination instead of the Indian manufacturers,

Jayaswals, Kalyani Brakes Limited, Krishna Engineering Works, and Nagpur Alloy Castings

Limited.  Id.


In contrast, Defendant argues that Commerce need not verify the Indian PAI submitted by

Respondents because Commerce is required to conduct verifications or "'on-the-spot

---

[47]     In relevant part, 19 U.S.C. § 1677m(i) (1994) states "[t]he administering authority shall
verify all information relied upon in making - (1) a final determination in an investigation. . . ."

investigations'" in the territory of only the "'exporting Member.'"  Defendant's Response at 27-

28.[48]  Since India is not an exporting member for purposes of this investigation, Defendant

claims that a verification is not required. Id. at 28.

The Court finds that Commerce's decision to use Respondents' PAI is supported by

substantial evidence and in accordance with law.[49]

As to the verification of PAI, a review of the record below reveals that Plaintiff failed to

raise this issue before Commerce, and, therefore, the Court is precluded from addressing it.  See

Petitioner's Pre-Hearing Brief.[50]  It is well established that "[a] reviewing court usurps the

---

[48]        Defendant cites to Article 6.7 and Annex I of the Antidumping Code discussing
verification of "exporting members."  However, in the SAA, "Part C. Action Required Or
Appropriate to Implement the Antidumping and Subsidies Agreements", the SAA discusses
verification in a "foreign country."  SAA at 868, 1994 U.S.C.C.A.N. at 4197.  Specifically, the
SAA states that "[t]he regulations will provide that Commerce will verify information in a
**foreign country** only after: (1) obtaining agreement from the persons whose information will be
examined; and (2) notifying the foreign government concerned of the details of the verification."
Id.  The SAA does not clearly state that the verification should only occur as to an exporting
member .

However, the SAA also states that the procedural rules under the Antidumping Code for
verifications balance "the investigating country's need for information, the exporting country's
sovereignty, and the investigated parties' need for reasonable advance notice."  SAA at 813, 1994
U.S.C.C.A.N. at 4156.  Thus, the legislative history seems to impliedly assume verification only
in the exporting member's territory.

[49]        The Court has already analyzed Plaintiff's argument regarding the submission of rebuttal
PAI and found no evidence in the record indicating an attempt by Plaintiff to submit rebuttal
PAI.

[50]        Plaintiff conceded at oral argument that it failed to raise this argument below.

agency's function when it sets aside the administrative determination upon a ground not therefore

presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and

state the reasons for its action."  Unemployment Compensation Comm'n of Alaska v. Aragon,

329 U.S. 143, 155 (1946).[51]

---

[51]     In this case, Commerce, implementing the NME procedure outlined above, chose India as a surrogate market economy resorted to PAI from Indonesia where surrogate prices from India could not be obtained.  Memorandum from The Team to The File of 2/21/97, ITA Pub. Doc. 494 at 1.  Commerce, relying on the surrogate information submitted by Respondents, valued the factors of production consistent with its policy of using PAI.  Id; see Magyar Gordulocsapagy Muvek v. United States, 19 CIT 921, 926, 890 F. Supp. 1111, 1116 (1995).  Because Plaintiff failed to raise the issue of verification below, there is no related record for the Court to review regarding Plaintiff's argument.

Whether Commerce must verify PAI when used as surrogate values has not been directly addressed in this Court.  Cf. Ipsco v. United States, 12 CIT 1128, 1133, 701 F. Supp. 236, 240-241 ("ITA may use generally available public information, such as IRS tables, . . . .").  The Court notes that Commerce has shown support for the proposition that publicly available valuation data need not be verified.  Proposed Rules: Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,324 (1998) ("Because publicly available valuation data is not verified, . . . ."); cf. Rules and Regulations: Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,332 (1997) (allowing use of factual information already on the record or information in the public realm to comment on verification report; submission of new factual information at this stage is inappropriate as it is not verified); Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China, 57 Fed. Reg. 21,058, 2,1062 (1992) (discussing reliability of publicly available factor price information).

Although the 1988 legislative history does not directly address this issue, the drafters noted that "[i]n valuing such factors [of production], Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices.  However, conferees do not intend for Commerce to conduct a formal investigation to ensure that such prices are not dumped or subsidized, but rather intend that Commerce base its decision on information generally available to it at that time."  H.R. Conf. Rep. No. 100-576 (1988) reprinted in 1988 U.S.C.C.A.N. 1547, 1623.  Reference to the 1988 legislative history is made as the URAA did not change this aspect of the antidumping statute.  Compare 19 U.S.C. § 1677b(c) (1988) with 19 U.S.C. § 1677b(c) (1994).

It should be noted that where surrogate values selected by Commerce are used as BIA, or facts available, the data need not be verified.  It is well-established that the BIA rule is exempted from the scope of 1677e(a)'s mandate that Commerce verify all data on which it relies.  Timken

Regarding Plaintiff's argument that Commerce failed to use Shivaji and Rico surrogate data in the Final Determinations, the Court notes that Commerce is not bound to use the same surrogate value information in the preliminary and final determination. NEC Corp. v. United States, 978 F. Supp. 314, 318 (CIT 1997) ("Commerce re-examines its analysis between the preliminary and the final determination.") aff'd. 151 F.3d 1361 (Fed. Cir. 1998).

Commerce also reasonably rejected data from Shivaji since the record evidence indicates Shivaji did not manufacture drums or rotors during the POI. ITA Pub. Doc. 494 at 18; Union Camp Corp. v. United States, 941 F. Supp. at 116 ("Generally, Commerce will select, where possible, publicly available published value which is . . . representative of a range of prices within the POI")

Commerce did, however, rely on information from Rico. Final Determinations at 9168 ("Based on publicly available information, we find that . . . Rico produced both brake drums and brake rotors within the scope of these investigations and sold during the POI. Therefore, we are using these Indian producers' financial reports to calculate surrogate percentages for use in both investigations."). Accordingly, Plaintiff's argument on that point is factually incorrect.

_____

Co., 12 CIT at 961, 699 F. Supp. at 305 ("It is thus permissible for Commerce to employ unverified data from the designated surrogate as the "'best information otherwise available'" . . . .); Ansaldo Componenti v. United States, 10 CIT 28, 34, 628 F. Supp. 198, 203 n.3 (1986) ("The 'best information rule' is an explicit exception to the verification requirement.") (citing 19 U.S.C. § 1677e(a)).

**I.**

**ITA Selection Of Surrogate Values For Castings
Of Respondent Shenyang And Selection Of Surrogate Values For
Various Factors Of Production Is Supported By Substantial Evidence.**

As discussed earlier, Commerce values the factors of production in a NME "based on the

best available information regarding the values of such factors in a market economy country."  19

U.S.C. § 1677b(c)(1) (1994).  Since the statute does not specify what constitutes best available

information, these decisions are within Commerce's discretion.  Accordingly, Commerce need

not prove that its methodology was the only way or even the best way to calculate surrogate

values for factors of production as long as it was a reasonable way.  Shieldalloy, 947 F. Supp. at

532.  When an agency's method is challenged,

> The proper role of this court, . . . is "to determine whether the methodology used
> by the [agency] is in accordance with law," and as "long as the agency's
> methodology and procedures are reasonable means of effectuating the statutory
> purpose, and there is substantial evidence in the record supporting the agency's
> conclusions, the court will not impose its own views as to the sufficiency of the
> agency's investigation or question the agency's methodology."

 GMN Georg Muller Nurnberg AG v. United States, 15 CIT 174, 178, 763 F. Supp. 607, 611

(1991) (citing Ceramica Regiomontana, S.A. v United States, 10 CIT 399, 404-05, 636 F. Supp.

961, 965-66 (1986), aff'd 810 F.2d 1137 (Fed. Cir. 1987)).

In choosing the factors of production, Commerce valued raw and semi-finished castings

for Respondent Shenyang based on the Indian foundry Jayaswals, having found "Jayaswals

financial statements provide the only appropriate Indian surrogate value for unfinished castings

on the record."  Final Determinations at 9171.  Additionally, Commerce valued pig iron and steel

scrap based on the "separated line item prices for each of these inputs in [Indian producer] Shivaji's 1995-96" financial report.  Id. at 9169. Commerce also valued steel sheet and steel wire rod from the Indian publication, Steel Authority for India Limited ("SAIL").  Id. at 9163.

Plaintiff argues that the "[t]he ITA's decision to assign to Shenyang a surrogate value for purchased castings based on Jayaswals values was contrary to law because such values do not indicate production comparable to the rotors subject to these investigations."  Plaintiff's Brief at 29.  For support, Plaintiff contends that the ITA stated that Jayaswals' financial statements do not indicate whether it purchases raw, semi-finished or finished castings.  Id. at 30 (citing ITA Pub. Doc. 494 at 17).    Plaintiff asserts that Commerce should have used value data from Shivaji, which is a producer of unfinished and semi-finished castings.  Id.

For valuation of pig iron, steel sheet, steel wire rod and steel scrap, Plaintiff argues that Commerce should have used data from the Monthly Statistics of Foreign Trade of India, (Import) Vol. II, from April, 1995 through July, 1995.  Id. at 12.  In addition, Plaintiff argues that "[t]he ITA should have calculated the values for ferrochromium, manganese, lubrication oil, and other factors of production as they were calculated by the ITA in the Preliminary Investigation, ITA Pub. Doc. 340, at 53,195-196 [sic]."  Id. at 15.

The Court finds reasonable Commerce's determination to use casting values from Jayaswals' financial statements and Commerce's valuation of pig iron, steel sheet, steel wire rod, steel scrap, ferrochromium, manganese, and lubrication oil.  First, regarding casting values, the

Court agrees with the Defendant's reasoning that, "despite the fact that the financial statement notes did not indicate the type of castings purchased by Jayaswals, the increased inventory values contained in the statement supported an inference that the company purchased raw castings (as opposed to finished castings), making the Jayaswals' data an appropriate surrogate to value [Respondent] Shenyang's unfinished and semi-finished castings." [52] Defendant's Response at 29. Additionally, as stated earlier, Commerce rejected the casting values offered by Indian foundry, Shivaji, because they data fell outside the POI. Therefore, given the discretion afforded to Commerce by Congress, the Court, finds that the ITA's selection of Jayaswals' casting as surrogate values for Shenyang is supported by substantial evidence.

As for the valuation of pig iron and steel scrap, the Court finds Commerce's determination to utilize the 1995-1996 financial report of the Indian producer Shivaji as surrogate values to be supported by substantial evidence. Although Plaintiff asserts that Commerce should not have relied on Respondent's PAI, Commerce actually did not rely on Respondent's PAI which included the Indian publication Steel Authority for India Limited (SAIL). Instead Commerce used the Shivaji financial reports because "Shivaji produces goods which are in the same general category as the subject merchandise . . . [and] the separate line-item values . . . in Shivaji's report are more specific than the prices . . . in . . . the Indian publication Steel Authority of India Limited ("SAIL") or in the Monthly Statistics [of the

---

[52]     The Jayaswals financial statements indicate that the "casting purchase price is 7,733 Rupees (RS)/metric ton (MT) whereas the opening and closing stock casting values are 11,044 RS/MT and 13,767 RS/MT, respectively. Based on the above figures, it appears that this company indeed purchased raw castings and machined those castings, thereby increasing their value once they were placed in inventory." ITA Pub. Doc. 494 at 17.

Foreign Trade of India]."  Final Determinations at 9163; see also ITA Pub. Doc. 494 at 4-5

(relying solely on Shivaji data because it is the only one that contains a value for iron scrap that

is not combined with a value for either pig iron, steel scrap or both).  Moreover, in response to

Plaintiff's concern that tax excluded values be used, Commerce stated that "[w]e have also

removed, where possible, any taxes included in the prices obtained from Shivaji's report."  Final

Determinations at 9169; see also ITA Pub. Doc. 494 at 4-5 (making the values tax exclusive).

Therefore, the Court finds Commerce's valuation of pig iron and steel scrap to be supported by

substantial evidence.  See Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep.

No. 100-576, at 591 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1624 ("Commerce should

seek to use, if possible, data based on production of the same general class or kind of

merchandise . . . .").


      As for steel sheet and steel wire rod, Commerce reasonably explained that the values

from SAIL for these factors of production "have been recognized as a definitive domestic source

in previous investigations and the prices are contemporaneous with the POI."  ITA Pub. Doc. 494

at 7.  As the Court stated earlier, Commerce's practice is to use publicly available values which

are "representative of a range of prices within the POI," Union Camp, 941 F. Supp. at 116, and

therefore, Commerce's decision to use values from SAIL is supported by substantial evidence

and in accordance with law.


      Finally, Plaintiff's argument that "[t]he ITA should have calculated the values for

ferrochromium, manganese, lubrication oil, and other factors of production as they were

calculated by the ITA in the <u>Preliminary Investigation</u>," Plaintiff's Brief at 15, is unpersuasive. As the Court stated earlier, Commerce is not bound to use the same surrogate value information in the preliminary and the final determination. <u>NEC Corp.</u>, 978 F. Supp. at 318, <u>aff'd</u> 151 F.3d 1361 (Fed. Cir. 1998).

Accordingly, Commerce's selection of surrogate values from Jayaswals for the valuation of castings for Respondent Shenyang, and its selection of surrogate values for the valuation of pig iron, steel sheet, steel wire rod, steel scrap, ferrochromium, manganese, and lubrication oil, is supported by substantial evidence and in accordance with law.

## IV.

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion is denied and the Court affirms Commerce's 1) decision not to apply "facts available" to all Respondents; 2) solicitation of and reliance on publicly available information from Respondents; 3) rejection of part of Plaintiff's administrative case brief; 4) determination to apply separate rates for selected Respondents; 5) assignment of margins based on averaged selected Respondents to non-selected Respondents; 6) critical circumstances determination with regards to non-selected Respondents; 7) rejection of Indian surrogate values from Shivaji; and 8) use of an Indian surrogate value from Jayaswals for castings for Respondent Shenyang and selection of surrogate values for valuing pig iron, steel sheet, steel wire rod, steel scrap, ferrochromium, manganese, and lubrication oil.

_____
Evan J. Wallach, Judge

DATED:      February 19, 1999
              New York, New York